AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
THE MONITORING OF GLOBAL POSITIONING SYSTEM
INFORMATION AND CELL SITE LOCATION DATA FOR AT&T
CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED
WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. §§ 2,
371, 1512(c), 1752(a), 2101, AND 40 U.S.C. § 5104(e)(2)

)
)
)
)
)
)
)

Case No. 21-sc-547

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18, U.S.C 18 § 371 - Conspiracy; 18 U.S.C. § 2 Aiding & Abetting; 18 U.S.C. §1512(c)(2) - Obstruct Official Proceeding; 18 U.S.C. § 1752(a) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 2101 - Riots; 40 U.S.C. § 5104(e)(2)(D)(G)- Violent Entry and Disorderly Conduct on Capitol Grounds.

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Eric S. McGuire, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 02/17/2021 _____

*Judge's signature*

City and state: _____ Washington, D.C. _____       G. Michael Harvey, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* THE | ) Case No.  21-sc-547 |
| MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION | ) |
| AND CELL SITE LOCATION DATA FOR AT&T CELL PHONE AND | ) |
| SEARCH OF INFORMATION ASSOCIATED WITH THE SAME | ) |
| NUMBER IN VIOLATION OF 18 U.S.C. §§ 2, 371, 1512(c), 1752(a), 2101, | ) |
| AND 40 U.S.C. § 5104(e)(2) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

See attachment A, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 3, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for __30__ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: ___02/17/2021___ _____
*Judge's signature*

City and state: ___Washington, D.C.___ ___G. Michael Harvey, U.S. Magistrate Judge___
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-sc-547 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 95
(Rev. 10/17)

## ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

### INFORMATION ON APPLICATION FOR DELAYED NOTICE

Please submit the information on this form each time judicial action is taken on an application for a delayed-notice search warrant or for an extension of a delayed-notice period. See 18 U.S.C. § 3103a(d)(1). If extensions to the notice period are requested, information will need to be submitted more than once.

Information should be submitted through CM/ECF. For more information, see the Delayed Notice Search Warrant page on the J-Net.

**Name of Judge:**   G. Michael Harvey                                              ( ☐ check if state court judge)

**Federal Judicial District:**   District of Columbia

1.   **Date of Application for Delayed Notice:**   02/17/2021

2.   **Offense (Most Serious) Specified:**
   *Although the warrant may state a specific offense, please consider the broader category in which the offense falls when selecting an offense.*

   ☐ Drugs          ☐ Extortion/Racketeering     ☐ Fraud          ☐ Fugitive/Escape
   ☐ Immigration    ☐ Kidnapping                 ☐ Sex Offenses   ☐ Tax
   ☐ Terrorism      ☐ Theft                      ☐ Weapons
   ☑ Other *(if possible, specify from the below):*   Obstruction, Violent Entry and Disorderly Conduct, Restricted Building

   | Arson | Assault | Bribery | Civil Rights | Computer |
   |-------|---------|---------|--------------|----------|
   | Conspiracy | Contraband | Counterfeit | Currency | Environment |
   | Espionage | Firearms | Gambling | IEEPA | Money Laundering |
   | Murder | Obstruction | Robbery | Smuggling | Wildlife |

3.   **Type of Application:**   ☑ Initial request for delay

   ☐ Extension of previously authorized delay
   *(Number of extensions previously granted: _____ )*

4.   **Judicial Action**   ☐ Denied          ☐ Granted          ☐ Granted as modified

5.   **Case Number (e.g., 'mc' Number) of Warrant:**   _____ : 21 - SC 547 _____
   office   year   type   number

6.   **Period of Delay Authorized in This Action (days):**   30

7.   **Preparer's Name:**  Jason B.A. McCullough          **Title:**   Assistant United States Attorney
   **Phone number:**   (202) 252-7233                    **Date of report:**   02/16/2021

**Please submit the information on this form electronically through CM/ECF.**

## ATTACHMENT A-1

### Property to Be Searched

1.       This warrant applies to records and information associated with the cellular device assigned to call number 407-619-7712 ("TARGET PHONE NUMBER"), which records show is assigned to user "Arthur Jackman" or Orlando, Florida, and whose service provider is AT&T Wireless ("PROVIDER"), a wireless communications service provider that is located at 11760 U.S. Highway 1 North Palm Beach, FL 33408.

2.       Information about the location of the TARGET PHONE NUMBER that is within the possession, custody, or control of PROVIDER, including information about the location of the cellular telephone if it is subsequently assigned a different number.

## **ATTACHMENT A-2**

1.      The subject of this investigation is Arthur Stanley Jackman, who is a 29 year-old resident of the state of Florida.

## ATTACHMENT B-1

### I.  Information to Be Disclosed by Provider

All information about the location of the TARGET PHONE NUMBER described in Attachment A-1 for a period of 30 days, during all times day or night.  "Information about the location of the target telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.  It further includes:

- Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

- Source and destination telephone numbers;

- Date, time, and duration of communication; and

- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET PHONE will connect at the beginning and end of each communication, as well as per-call measurements data (also known as PCMD, RTT, NELOSE, TrueCall or similar).

It also includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C § 3123 by the service provider and the Federal Bureau of Investigation.  The pen register / trap and trace device shall be transferable to any change dialed number subsequently assigned to a device bearing the same ESN, IMSI or SIM as the target cell phone; any changed ESN, IMSI or SIM subsequently assigned the same dialed number as the target

3

cell phone; or any additional changed dialed number, ESN, IMSI or SIM listed to the same subscriber account as the target cell phone.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of PROVIDER, PROVIDER is required to disclose the Location Information to the government.  In addition, PROVIDER must furnish the government all information, facility, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the target telephone on PROVIDER's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government.  The government shall compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**II.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section I. That information that is within the scope of Section I may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an order

of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**Attachment B-2**

**Particular Things to be Seized**

I. **Government procedures for warrant execution**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/TARGET PHONE NUMBER listed in Attachment A-1:

a. The following information about the customers or subscribers associated with the TARGET PHONE NUMBER/Account for the time period November 3, 2020, through the present.

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONE NUMBER/Account, including:

A. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

B. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and

C. all available per-call measurement data and all available NELOS reports.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 1512(c), 1752(a), and 2101, and 40 U.S.C. § 5104(e)(2), and aiding and abetting (18 U.S.C. § 2) and conspiracy to commit the same (18 U.S.C. § 371), involving Arthur Stanley JACKMAN and other individuals during the period of November 3, 2020, through the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an order

of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR AT&T CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. §§ 2, 371, 1512(c), 1752(a), 2101, AND 40 U.S.C. § 5104(e)(2) | **Case No. 21-SC-547** <br><br> **Filed Under Seal** |

*Reference:*      *USAO Ref. # 2021R00318; Subject Account(s): 407-619-7712*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Eric McGuire, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), and former Chief Judge Hogan's Memorandum Opinion in In the Matter of the Application of the United States for an Order Authorizing the Monitoring of Geolocation and Cell Site Data for a Sprint Spectrum Cell Phone Number ESN, 2006 WL 6217584 at *4 (D.D.C. 2006) (Hogan, C.J.) ("Hogan Opinion"), for information about 1) the prospective location of the cellular telephone assigned call number 407-619-7712, (hereinafter referred to as the "TARGET PHONE NUMBER"), as detailed in Attachment B-1; and 2) historic location data for the TARGET PHONE NUMBER, as detailed in Attachment B-2[1], whose service provider is AT&T ("PROVIDER"), a wireless telephone service

---

[1] Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review the information to locate items described in Section II of Attachment B-2.

provider headquartered at 11760 U.S. Highway 1 North Palm Beach, FL 33408.  As a provider of wireless communications service, PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. § 3123(b)(1).  A certification by Jason B.A. McCullough, an attorney for the government, that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation ("FBI") is included on the signature page of this affidavit.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so since February 2010.  As such, I am an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I have testified during an array of judicial proceedings, conducted physical and electronic surveillance, administered confidential sources, and received training as investigative techniques evolve. I have interviewed hundreds of defendants, witnesses, and informants.  In addition to my regular duties, I am currently also tasked with investigating criminal activity that occurred in and around the Capitol grounds on January 6, 2021.

4.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals

including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1512(c), 1752(a), 2101, and 40 U.S.C. § 5104(e)(2), and aiding and abetting (18 U.S.C. § 2) and conspiracy to commit the same (18 U.S.C. § 371), have been committed by Arthur Stanley JACKMAN and other identified and unidentified individuals.  There is also probable cause to believe that the historical location information, as described in Attachment B-2, and that the prospective location information, as described in Attachment B-1, will constitute evidence of these criminal violations.  Moreover, the prospective location information described in Attachment B-1 will provide evidence of where the phone is currently located, and there is probable cause to believe the phone is an instrumentality of the offenses described herein.

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## **PROBABLE CAUSE**

*Arthur Stanley JACKMAN*

3

7.      Arthur Stanley JACKMAN is a 29 year-old resident of the state of Florida. JACKMAN is a self-admitted member of a group known as the Proud Boys, and he has a Proud Boys tattoo on his left wrist.

8.      Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

*Proud Boys' Appearances at Demonstrations in Washington, D.C.*

9.      On or about November 14, 2020, the "Million MAGA March" was held in Washington, D.C. The Million MAGA March was a widely-attended demonstration in Washington, D.C., which was organized as a peaceful exercise of demonstrators' First Amendment rights with respect to the 2020 Presidential election. Members of the Proud Boys attended the demonstration wearing their yellow and black colors and other recognizable emblems and logos associated with the group.

10.      On or about December 12, 2020, a similar demonstration took place in Washington, D.C. (the "December Demonstration"). Like the Million MAGA March, the December Demonstration was organized as a peaceful First Amendment demonstration, and one focus of the demonstration was to protest against the vote of the Electoral College on that upcoming Monday, December 14, 2020. Certain persons dressed in Proud Boys colors and wearing Proud Boys

emblems and logos attended the demonstration. According to a voluntary statement that JACKMAN provided to law enforcement, JACKMAN was in Washington, D.C. with other Proud Boys members on December 12, 2020.

*Communications by the Proud Boys About the January 6 Demonstration at the U.S. Capitol*

11.     Your affiant has reviewed publicly available posts by the account identified as @NobleLead (vanity name: Tarrio Unchained) on the social media platform Parler.[2] At the time of this writing, the Parler site is unavailable; however, certain public-facing posts by the account described herein are available on the Internet Archive's "wayback machine." The Internet Archive functions to preserve certain publicly available internet pages at particular moments in time, i.e., it takes a snapshot of the appearance of a public-facing webpage. As a result, one can use the Internet Archive's "wayback machine" to retrieve website information from a particular time if a snapshot was taken of the particular public-facing webpage. I have been advised by other agents at the FBI that the Internet Archive employs a process that produces a historical snapshot that accurately records the content of publicly available web pages on the day that the snapshot was taken.

12.     As described in more detail herein, I have probable cause to believe that @NobleLead is operated or controlled by or at the direction of Enrique Tarrio. As shown in the image below, the header of @NobleLead attributes the account to vanity name "Tarrio Unchained" and indicates that the operator is the "Proud Boy Chairman." I know from this investigation that Tarrio holds himself out as the national leader of the Proud Boys. In addition, various photographs of Tarrio appear in the posts on @NobleLead. Furthermore, as described in more detail below,

---

[2] Parler is a social media platform similar in nature to Twitter, Facebook, and Instagram. Events such as the Million Maga March were widely shared and discussed using the Parler platform.

certain postings by @JoeBiggs, which is believed to be operated or controlled by or at the direction of Biggs, are "echoed" or reposted by @NobleLead.



13.     As described in more detail herein, I have probable cause to believe that the account @JoeBiggs (vanity name: Joe Biggs) is operated or controlled by or at the direction of Joseph Biggs. Biggs[3] is a self-described organizer of events and demonstrations attended by the Proud Boys. The vanity name and account name both match the true name of Biggs. In addition, a person that I recognize as Biggs appears in at least one picture and one video posted on the account. For example, on or about January 1, 2021, @JoeBiggs posted a message that contained a photograph of a person that I recognize as Biggs and one other person. In the photo, Biggs appears to be taking

---

[3] Biggs has been charged in this Court, Case No. 21-mj-126 (RMM), with violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), and 40 U.S.C. § 5104(e)(2)(D) and (F) in connections with his actions at the Capitol on January 6, 2021.

a selfie. The post was then "echoed" or reposted by @NobleLead (Tarrio), along with a comment "Bullsh**, I ain't there." Your affiant understands this comment by @NobleLead (Tarrio) to be in reference to the fact that the person in the photo looks vaguely like Tarrio, but is not believed to be Tarrio.



14. On or about September 29, 2020, during a Presidential debate, President Donald J. Trump was asked, in substance, about violence that was taking place in various cities across America in connection with protests for social justice. President Trump responded, in part, with a reference to the Proud Boys, in which he admonished them to "Stand back, and stand by."

15. On or about December 19, 2020, President Trump announced plans for further protests of the election via post on Twitter. Specifically, the Tweet read, "A great report by [NAME

REDACTED]. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!"

16.     Shortly thereafter, in December 2020, public communications from Proud Boys leadership encouraged members of the Proud Boys to attend the January 6, 2021, demonstration in Washington, D.C. As described in more detail below, such communications included messages on social media sent by Tarrio and Biggs.

17.     For example, on or about December 28, 2020, Tarrio (using @NobleLead) posted a message that read "I'll be making an announcement about @theproudboys and Jan 6th tomorrow…" The message then continues, "Chess…always chess." Based on your Affiant's familiarity with social media sites, your Affiant believes that the reference to @theproudboys is a reference to another account on the platform.

18.     The next day, on or about December 29, 2020, Tarrio (using @NobleLead) posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows….we might dress in all BLACK for the occasion." I believe the statement about dressing in "all BLACK" is a reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black to demonstrations.

19.     On or around the same day, Biggs (using @JoeBiggs) posted a similar message to his followers on Parler in which he stated, among other things, "we will not be attending DC in colors. We will be blending in as one of you. You won't see us. You'll even think we are you.  We

are going to smell like you, move like you, and look like you. The only thing we'll do that's us is think like us! Jan 6th is gonna be epic." I understand that Biggs was directing these statements at "Antifa."

20.     Separately, Biggs has described the Proud Boys' efforts, in general, to plan for demonstrations and events attended by the Proud Boys. In an interview that was purportedly taped in December 2020 and posted online on or about January 3, 2021, Biggs described how he, as an organizer of Proud Boys events, sets about planning them. Biggs explained, in part:

> When we set out to do an event, we go alright, what is or main objective? And that's the first thing we discuss. We take three months to plan an event. And we go, what's our main objective? And then we plan around that, to achieve that main objective, that goal that we want.

21.     On or around January 1, 2021, Tarrio (using @NobleLead) posted a message that read "Lords of War." The post was also "tagged" with the identifiers "#J6" and "#J20." Your affiant believes that the references to #J6 and #J20 refer to January 6 and January 20, 2021, the dates of the Certification of the Electoral College for the 2020 Presidential Election and the 2021 Presidential Inauguration, respectively. The message included a picture of a group of men that are wearing Proud Boys colors, logos, and emblems. The person depicted in the center of the photograph is believed to be Proud Boy Dominic Pezzola, who has been charged with, among other things, 18 U.S.C. §§ 1361 and 1752, for his unlawful breaking of a window and entry into the U.S. Capitol with a riot shield on January 6, 2021.



*JACKMAN's Participation in Unlawful Events at the Capitol on January 6, 2021*

22.    I have studied video footage and still photographs of the January 6, 2021, incursion of the U.S. Capitol, and I have identified an individual in them as JACKMAN through comparison of those images to photographs and videos of JACKMAN that are widely available online.  As described herein, the images and video footage that I have reviewed, as well as the other facts gathered in this investigation, establish that JACKMAN did conspire with others to unlawfully enter the U.S. Capitol by means of destruction of federal property and did corruptly obstruct the official proceedings underway at the U.S. Capitol on January 6, 2021.

23.    On January 6, 2021, individuals that I have identified as a group of people that hold themselves out as Proud Boys were depicted on the east side of the U.S. Capitol. Consistent with the directive issued by organizers of the Proud Boys, including Tarrio and Biggs, none of the men

pictured are wearing Proud Boys colors of black and yellow, but are instead dressed "incognito." Indeed, Biggs, wearing glasses and a dark knit hat, is dressed in a blue and grey plaid shirt.



24.     Biggs was identified in a video taken by a man purporting to be a member of the Proud Boys ("Individual A"). Specifically, Individual A gave an interview to ABC Action News, which was published online on January 9, 2021. As part of that interview, Individual A shared footage that Individual A claims was taken on January 6, 2021, while Individual A and others were participating in the demonstration. In the version of the interview produced online, Individual A can be heard saying, "Yeah, that's Joe Biggs, that's Rufio." Based on my investigation, I understand Individual A to be identifying the man in the plaid shirt as Biggs, and the man in the

sunglasses as Proud Boy Ethan Nordean[4], a/k/a Rufio Panman. Standing at the left is someone that I recognize as another Proud Boy, Zach Rehl.



25.     At or around January 6, 2021, Biggs, Nordean, Rehl, and others were observed marching at the front of a group of individuals on Constitution Avenue, Northwest, in the area around First Street, Northwest. The group was engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!" Your affiant has not identified footage that shows JACKMAN within this group of individuals.

26.     Biggs, Nordean, Rehl, and others then stopped at or around 12:15 p.m. near Second Street and Constitution Avenue, NW. Your affiant has not identified footage that shows JACKMAN within this group of individuals.

*A Crowd Advances Towards the U.S. Capitol*

---

[4] Ethan Nordean was arrested on February 3, 2021, and charged in Case No. 21-mj-195, with 18 U.S.C. §§ 1512(c)(2), 1361 (aiding and abetting), 1752(a), and 40 U.S.C. § 5104(e)(2)(D) and (F).

27.     U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

28.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

29.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

30.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

31.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00

p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m. EST, the House

and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike

Pence was present and presiding, first in the joint session, and then in the Senate chamber.

32.     As the proceedings continued in both the House and the Senate, and with Vice

President Pence present and presiding over the Senate, a large crowd gathered outside the U.S.

Capitol.  As noted above, temporary and permanent barricades were in place around the exterior

of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from

the Capitol building and the proceedings underway inside.

33.     At around 1:00 p.m. EST, known and unknown individuals broke through the police

lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and

supporting law enforcement officers there to protect the U.S. Capitol.

34.     The image below depicts a large crowd that was gathered near the pedestrian

entrance to the Capitol grounds on First Street at around 1:00 p.m. EST. The entrance was secured

by a small number of USCP, who stood behind a waist height metal barrier.



35.     Biggs was present in the crowd depicted above, and Biggs attempted to lead others

in various chants using a megaphone.

36.     Shortly after that above image was captured on video, two men walked to the edge of the pedestrian walkway and then began walking defiantly toward a waist-high metal gate, which was being guarded by only a handful of U.S. Capitol Police.



37.     The crowd followed, and within minutes, the crowd overwhelmed the U.S. Capitol Police officers seen at the top of the steps in the image above. The crowd then advanced toward the U.S. Capitol. Your affiant asserts that Biggs was not one of the two men who initially advanced toward officers, but was present in the crowd depicted in the image above.

38.     After overwhelming USCP at the pedestrian gate, the crowd advanced on the U.S. Capitol where another line of U.S Capitol Police and barricades attempted to stop the crowd from advancing to the walls of the building. Among those leading the walk to the next barrier were Proud Boys Dominic Pezzola (in black hat and sunglasses below) and William Pepe (in flag bandana below).[5] Upon arriving at the next barrier, Pepe dragged a segment of the fence away, which left U.S. Capitol Police officers temporarily without barrier.

---

[5] Dominic Pezzola and William Pepe were charged by indictment on January 29, 2021, in case number 21-cr-52. Charges include conspiracy to interfere with law enforcement as well as other individual charges, for their actions at and inside the U.S. Capitol on or about January 6, 2021. As described below, Pezzola has been photographed at Proud Boys rallies.  The FBI also executed search warrants at both Pezzola's and Pepe's residences and found Proud Boys paraphernalia.





39.     The next police line was overwhelmed by crowds and the crowd advanced to the front of the U.S. Capitol. Additional people continued to arrive until what I estimate to be thousands of people had gathered in front of the Capitol on its west side.

40.     A person that I recognize as JACKMAN (on left) can be seen in the image below standing in close proximity to Proud Boys Biggs and Rehl (on right).



41.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

42.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

43.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

44.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.

45.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

46.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

47.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

48.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

49.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

50.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

51.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

52.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

53.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

54.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

*Arrest of Proud Boys Member Dominic Pezzola*

55.     On January 8, 2021, FBI received a lead depicting publicly available photographs and videos of an unknown individual breaking the window of the U.S. Capitol Building, which is located in Washington, D.C., with a clear plastic shield, and then entering the Capitol building. Below are screen shots from one such video.



56.     The individual has since been identified as Dominic Pezzola. Pezzola is an identified member of the Proud Boys, as can be seen in the image below, which was taken during a Make America Great Again (MAGA) rally in Washington, D.C. on or about December 12, 2020. Indeed, the photograph is identical or nearly identical to the photograph posted by Tarrio (using

@NobleLead) with the tags #J6 and #J20, as referenced above in Paragraph 21.



*Arrest of Proud Boys Member Joe Biggs*

57.     I have reviewed video footage that was live streamed on the social media site Parler on January 6, 2021. One of those clips shows what I believe to be people entering the Capitol shortly after the events described in the preceding Paragraphs 55 - 56. One of those individuals, who entered the door within approximately 50 seconds of its opening,[6] is a person that I believe to be Biggs. In the video, a voice off camera says, "Hey Biggs, what do you gotta say?" The person

---

[6] Your affiant is aware that previous affidavits submitted in connection with this investigation stated that based on time stamps on social media posts, this intrusion happened within 20 seconds or approximately 20 seconds of the opening of the door.  Based on additional photographic and video evidence depicting Biggs inside the capitol, the timestamps associated therewith, and other information collected in the course of this investigation, your affiant now asserts that the time of entry is within approximately 50 seconds of the opening of the door.

depicted below smiles broadly and replies, "this is awesome!" before pulling his gaiter up to cover his face.



58.     On or about January 18, 2021, Biggs spoke with agents of the FBI after video emerged online of him inside the U.S. Capitol. Biggs stated, in substance and in part, that he was present in Washington, D.C. for the demonstration on January 6, 2021. Biggs admitted to entering the Capitol building on January 6, 2021, without forcing entry.  Biggs informed the interviewing agent that the doors of the Capitol were wide open when he made entry into the building.  Biggs denied having any knowledge of any pre-planning of storming the Capitol, and had no idea who planned it.

59.     Biggs has since been charged in this Court, Case No. 21-mj-126 (RMM), with violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), and 40 U.S.C. §§ 5104(e)(2)(D) and (F) in connections with his actions at the Capitol on January 6, 2021.

*Activities of Proud Boys Leader Enrique Tarrio*

60.     On December 13, 2020, Tarrio and other persons dressed in Proud Boys colors and emblems destroyed a "Black Lives Matter" banner displayed by a church in Washington, D.C. Tarrio charged by criminal complaint on or about December 30, 2020 (2020 CRWSLD 5553), and Tarrio was arrested in Washington, D.C. on January 4, 2021. As part of his conditions of release, Tarrio was ordered to stay away from the entire District of Columbia for the pendency of his case, to include the events on January 6, 2021. As of the writing of this warrant, Tarrio's criminal case is still pending, however, Tarrio has admitted through various platforms, including Parler, that he was responsible for banner's destruction.

61.     On or about January 6, 2021, Tarrio (using @NobleLead) posted several messages on Parler that appear to reference the incident at the U.S. Capitol. Among other messages, Tarrio wrote, at least in part: "Don't f*cking leave" and "After I finish watching this I'll make a statement about my arrest. But for now I'm enjoying the show." With this post, Tarrio included a picture of what I believe to be the emperor from the Star Wars Episode VI: Return of the Jedi.



62.     Tarrio also posted a message that read: "Proud Of My Boys and my country." I recognize "Proud Of My Boys" to be a declaration of encouragement or congratulations used by the Proud Boys.

63.     Tarrio (using @NobleLead) also posted a message that appears to show a rioter in one of the chambers of the U.S Congress. The post read simply: "1776."

*JACKMAN's Presence at the Capitol on January 6, 2021*

64.     On or about January 22, 2021, federal agents with the FBI interviewed a witness (W-1).  W-1, a childhood friend of JACKMAN, reported to FBI that W-1 had texted JACKMAN during the Capitol riots and asked JACKMAN whether he was involved.  According to W-1, JACKMAN texted back that he was, and subsequently texted a photo of himself inside the Capitol. W-1 asserted that W-1 had deleted the text and picture, but W-1 asserted that before doing so, W-

1 had sent the text and picture to another individual (W-2). W-2 subsequently provided a
photograph to the FBI that W-2 asserted IT had received from W-1. Such image is included below.



65.    W-1 also provided the FBI with a video that had been recorded by a New Yorker
reporter and subsequently posted online. In the video, W-1 identified the person seen below in the
red plaid shirt with black gaiter as JACKMAN. The screen capture below shows JACKMAN
walking up a flight of stairs behind a person that I recognize as wearing the same clothing as Proud
Boy organizer, Joe Biggs. In the second image below, JACKMAN can be seen with his hand on
such person's shoulder.





66.     Based on my extensive review of video footage of the events of January 6, 2021, your affiant asserts that JACKMAN can also be seen in the image below standing in the gallery of the Senate chamber.



67.     Another screen capture of the video appears to show JACKMAN taking a "selfie" inside the Senate chamber. Notably, JACKMAN's cell phone appears to have insignia that I recognize as being associated with the Proud Boys (i.e., a yellow laurel wreath co-opted from the clothing brand, Fred Perry). In the selfie, JACKMAN appears to be making a gesture that I recognize as being associated with the Proud Boys (i.e., the "okay" symbol). Such evidence indicates that JACKMAN is associated with the Proud Boys.



68.     Your affiant notes that the photograph that was provided by W-2 (and seen in Paragraph 64) appears to be a mirror image of the image that could have been captured by a "selfie" taken in the preceding paragraph.

69.     On or about January 19, 2021, federal agents with the FBI interviewed JACKMAN at his residence. JACKMAN participated voluntarily. Among other things, JACKMAN stated that:

    a.   He was a Proud Boys member and had been since 2016;

    b.   He became involved in the Proud Boys to support Donald Trump;

    c.   He was in Washington, D.C., on January 6, 2021;

    d.   He went to Washington, D.C. to be a "visual representation, to support President Trump and to stop the steal;"

    e.   He believes the election was stolen;

f.   He and other Proud Boys were not there to infiltrate the Capitol as it was not a sanctioned Proud Boys event; and

g.   He had "no comment" as to whether he was inside the Capitol on January 6, 2021, or if any pictures would show him inside.

70.     On or about February 6, 2021, PROVIDER was served with a Grand Jury Subpoena that sought toll records for the TARGET PHONE NUMBER. On or about February 14, 2021, PROVIDER responded and indicated that the TARGET PHONE NUMBER is currently registered to user, "Arthur Jackman" of Orlando, Florida. According to the records produced by PROVIDER, the TARGET PHONE NUMBER was active on January 6, 2021, with numerous inbound and outbound calls appearing on the toll records.

71.     Lawfully-obtained Google records show that a Google account associated with the TARGET PHONE NUMBER was connected to Google services and was present in or around the U.S. Capitol on January 6, 2021. Specifically, the Google records show that JACKMAN was inside various locations within the Senate wing (*i.e.*, the Northern end) of the Capitol, which is consistent with the photographs included at Paragraphs 64, 66, and 67. As discussed herein, the background of that photograph indicates that the photograph was taken from inside the Senate chamber.

## BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION

72.     In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records."  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology

built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

73.     Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on PROVIDER's network or with such other reference points as may be reasonably available.

74.     Based on my training and experience, I know that PROVIDER can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

75.     Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data

estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

76.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

77.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE NUMBER's user or users.

**REQUEST TO SUBMIT WARRANT BY TELEPHONE
OR OTHER RELIABLE ELECTRONIC MEANS**

78.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Christopher Berridge, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

**AUTHORIZATION REQUEST**

79.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

80.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1 for each communication to or from the TARGET PHONE NUMBER, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

81.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court direct PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the Target Telephone on PROVIDER's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

31

82.     Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

83.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## **CONCLUSION**

84.     I submit that this affidavit supports probable cause for a warrant to collect the requested information about the location of the Target Telephone, as described in Attachment A, and to seize the evidence described in Attachment B.

Respectfully submitted,

_____
Eric McGuire
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 17th day of February 2021.

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

32

**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order.  I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation. *See* 18 U.S.C. §§ 3122(b), 3123(b).

  _/s/Jason B.A. McCullough_____
Jason B.A. McCullough
Assistant United States Attorney
District of Columbia

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC
### RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
### 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by Verizon Wireless, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

Verizon Wireless.  The attached records consist of _____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Verizon Wireless, and they were made by Verizon Wireless as a regular

practice; and

b.     such records were generated by Verizon Wireless's electronic process or system

that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Verizon Wireless in a manner to ensure that they are true duplicates of

the original records; and

   2. the process or system is regularly verified by Verizon Wireless and at all times pertinent to the records certified here the process and system functioned properly and normally.

   I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
Date            Signature